**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RAYSHEON MARQUISE BURTON<br><br>Petitioner,<br>v<br>D. PARAMO, Warden, et al.,<br><br>Respondents. | CASE NO. 13-CV-1459-WQH (MDD)<br><br>REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS |

## I.  INTRODUCTION

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.  After reviewing the Petition (ECF No. 1), Respondents' Answer and Memorandum of Points and Authorities in support thereof (ECF. No. 7), Petitioner's Traverse (ECF No. 12), and the supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for the reasons stated below.

## II.  FEDERAL PROCEEDINGS

On June 24, 2013, Raysheon Burton ("Petitioner"), a California state prisoner proceeding *in forma pauperis*, filed a Petition for Writ of

1  Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner
2  challenges his conviction in San Diego Superior Court Case No. SCD
3  215531 for first degree murder and premeditated attempted murder.
4  (ECF No. 1 at 2; Lodg. No. 6 at 1-2.)
5      Petitioner's sole claim is that the trial court's exclusion of co-
6  defendant Warren Hargrove's statements violated his federal
7  constitutional rights. (ECF No. 1 at 8-9.)
8      On September 4, 2013, Respondents answered the Petition.  (ECF
9  No. 7.)  Respondents contend that habeas relief is not appropriate
10 because the California Court of Appeal properly rejected Petitioner's
11 evidentiary arguments and acted in accordance with clearly established
12 federal law.  (ECF No. 7-1 at 8-12.)  On November 15, 2013, Petitioner
13 filed his Traverse.  (ECF No. 12.)

## III.  STATE PROCEEDINGS

15      On July 23, 2008, Petitioner was charged by information with
16 murder, in violation of California Penal Code section 187(a), and
17 premeditated attempted murder, in violation of California Penal Code
18 sections 187, 664, and 189.  (Lodg. No. 1 at 7.)  As to the murder charge,
19 the information alleged that Petitioner: (1) intentionally and personally
20 discharged a firearm and caused great bodily injury and death to a
21 person (Cal. Penal Code § 12022.53(d)); (2) personally used a firearm
22 (Cal. Penal Code § 12022.53(b)); (3) intentionally and personally
23 discharged a firearm (Cal. Penal Code § 12022.53(c)); and (4) was armed
24 with a firearm (Cal. Penal Code § 12022(a)(1)).  (Lodg. No. 1 at 8.)  As to
25 the attempted murder charge, the information further alleged that
26 Petitioner: (1) personally used a firearm (Cal. Penal Code § 12022.5(a));
27 (2) intentionally and personally discharged a firearm and caused great
28 bodily injury or death (Cal. Penal Code § 12022.53(d)); (3) personally

used a firearm (Cal. Penal Code § 12022.53(b)); (4) intentionally and personally discharged a firearm (Cal. Penal Code § 12022.53(c)); and (5) was armed with a firearm (Cal. Penal Code 12022(a)(1)). (Lodg. No. 1 at 8.)

The Petitioner and co-defendant Hargrove were tried by dual juries.[1] The jury found Petitioner guilty on all counts and found the firearm enhancement allegations to be true. (Lodg. No. 1 at 177.) Petitioner was sentenced to a total term of life plus 75 years to life. (*Id.* at 218.)

On February 18, 2010, Petitioner filed a Notice of Appeal of his conviction. (Lodg. No. 1 at 220.) In his appeal, Petitioner contended the trial court erred, in violation of Petitioner's Fifth and Sixth Amendment rights, when it excluded Hargrove's statements to police regarding Petitioner's mental capacity. (Lodg. No. 3 at 23.)

On January 13, 2012, the California Court of Appeal affirmed the Petitioner's conviction, finding that the trial court properly exercised its discretion in ruling Hargrove's statements were inadmissible hearsay under California Evidence Code section 1200. (Lodg. No. 6.)

On February 24, 2012, Petitioner appealed to the California Supreme Court. (Lodg. No. 7.) The California Supreme Court denied review on March 28, 2012, without comment. (Lodg. No. 8.)

**III. STATEMENT OF FACTS**

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The court must be

---

[1] Petitioner and Hargrove had a joint trial before dual, independent juries because Petitioner and Hargrove each claimed the other was the shooter. (Lodg. No. 6 at 12.) When Petitioner's jury reached a verdict in April, the trial court sealed the verdict pending a verdict from Hargrove's jury. In late April, after a mistrial was declared in Hargrove's case, the trial court unsealed and recorded the verdict in Petitioner's case. (*Id.*)

- 3 -  13-cv-01459-WQH (MDD)

"particularly deferential to [its] state-court colleagues." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). When a state court does not supply reasoning for a decision, an independent review of the record is required to determine if the court clearly erred in applying controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). This independent review is not *de novo*, but merely provides the basis for determining whether the state court decision was objectively reasonable. *Id.* Accordingly, the following facts from the California Court of Appeal's opinion are presumed correct:

### 1. *The 2007 murder and stabbing*

In 2007, Gregory Smith, a friend of Burton and Burton's friend and accomplice co-defendant Warren Hargrove III, was shot and killed by Kevin Marquez. About a week after Smith's killing, Andre Mann and Beltran were involved in a stabbing incident during an altercation at an apartment complex in the Clairemont area of San Diego, where Beltran lived with his two sisters. Fearing for his life after the stabbing incident, Beltran fled to Mexico for about four months. Before he left, Beltran told his girlfriend Samantha Sanchez that he was afraid something was going to happen to him.

### 2. *Encounter with Hargrove and Burton*

Sanchez and her friend Ashley Garcia, also a friend of Beltran, encountered Burton and Hargrove one evening at the apartment complex. Initially the encounter was cordial . . . things became heated because Hargrove was angry about the death of Smith. Hargrove believed Smith was killed by a "Mexican," and he told Sanchez and Garcia that whoever killed Smith was "going to get payback for what they did" and that "[someone] is going to get their ass kicked.
Sanchez later told police that during this exchange. Hargrove threatened "every Mexican's gonna get it." Garcia also reported . . . that Hargrove told Sanchez that a stabbing was not the 'worst] that's going to happen' and that he will 'make sure that when [Beltran] dies, my [Hargrove's] name is in your head.'
In September 2007, Burton and Hargrove applied for and received range cards at the American Shooting Center . . . The records from the range show that Burton used the range on the same day he obtained his range card . . . .
From October 2007 through February 2008, Hargrove lived with Tonya Aune, his girlfriend . . . Aune helped Hargrove purchase a white late model four-door Cadillac.

- 4 -                                         13-cv-01459-WQH (MDD)

On March 17, 2008, Smith's mother had a memorial party for her son. Burton and Hargrove attended, along with other friends and family.

3. *The March 18, 2008 murder*

[On March 18, 2008], Patricia Mathena met Hargrove and Burton at Hargrove's family's house. Mathena recalled Burton that night was wearing a brown pair of Dickie pants and a black hooded sweatshirt. After they ate and hung out for a while, Hargrove and Burton followed behind Mathena in the white Cadillac as she drove her family car home. After dropping off the car at about 11:00 p.m., Mathena got in the back seat of Hargrove's Cadillac and together they planned on taking Burton home and then going out.

On their way to Burton's home, Hargrove drove down Chateau drive near the apartment complex. At the same time, Rosalio H. was walking with Beltran, who was slowly pedaling his bike as the two left a convenience store and headed towards Beltran's home nearby. As they walked, Rosalio testified he saw an African-American man sitting in the passenger seat staring at them as the Cadillac passed by. After the car drove by Rosalio and Beltran, Mathena recalled Burton saying, "I think that's the guy that stabbed Andre [Mann]."

Hargrove pulled over . . . and he and Burton exited the Cadillac and walked up the middle of the street towards Rosalio and Beltran. Rosalio recalled a darker skinned African-American man (later identified as Burton) in a dark hooded sweatshirt getting out of the passenger seat. Both Hargrove and Burton appeared to be wearing gloves.

As Hargrove and Burton walked past Rosalio and Beltran, Rosalio heard one of the men ask, "where are you from?" As Rosalio looked over his shoulder, he saw the darker-skinned African-American man, about 20 feet away, begin shooting at them. In court, Rosalio identified Burton as the shooter with 70 percent certainty. Rosalio did not see the face of Burton's companion, but testified the other man was lighter skinned than Burton.

Rosalio received bullet wounds to his left leg and back. Rosalio also saw Beltran being hit by gunfire. Rosalio ran to the opposite side of the street and fainted on the sidewalk. After he got up, Rosalio saw Beltran fall off his bicycle and the two African-American men run towards the fire station at the end of the block. Rosalio ran back to where Beltran lay and told Beltran he would get help . . . .

Several residents living on Chateau Drive heard the gunshots. From their windows, two of the residents each testified they saw two males –one wearing all dark clothing and the other wearing a light shirt and dark pants–running towards the fire station and down the alley. One of the residents saw a white Cadillac drive down the street . . . . Another resident saw an individual, later identified as Rosalio, get up from the ground and limp over to where the other man, later identified as Beltran, was rolling on the ground ostensibly in pain. As this resident called 9-1-1, she

could hear Beltran through an open window saying, "Help me. Somebody help me." This resident then saw Rosalio run to get help . . . . As the resident continued to look out the window, she saw a "white car" drive by at about 11:10 p.m. in the direction of the fire house.

. . . .

About 11:12 p.m. that night, San Diego Police Officer Kevin Conkle was nearby when he received a dispatch about the shooting. Officer Conkle and another police officer found Beltran lying on the ground, moaning and moving side to side. In response to the officers' question whether he was shot, Beltran said "Yes" but he did not respond to any other questions posed by the officers. Before paramedics arrived, Beltran appeared to have a seizure, gave his final breath and then his body went limp.

Beltran died from a gunshot wound to the thorax, which caused extensive internal injuries. Beltran also received gunshot wounds to his right hand and his right hip. All of Beltran's wounds were inflicted from behind.

4.   *The events following the March 18, 2008 murder*

Mathena testified that after Burton and Hargrove exited the white idling Cadillac, Mathena moved into the front seat of the car. A few seconds later, after she lost sight of the two men, she testified she heard about five loud gunshots coming from their direction. Scared and concerned, Mathena took off in the Cadillac, made a U-turn on Chateau Drive and drove back the way Burton and Hargrove had walked . . . . After driving a few minutes and unable to locate Burton and/or Hargrove, Mathena decided to drive home.

On the way, a police officer pulled behind her and put a spotlight on the Cadillac. Mathena abruptly pulled over and was subsequently arrested.

. . . .

On questioning, Mathena denied any knowledge of a shooting and instead told police she had picked up three Hispanic males she barely knew and had dropped them off at a fast-food restaurant. Mathena gave the police fake names for the men. However, Mathena subsequently changed her story after police told her that she could receive a lengthy prison sentence for her involvement in the shooting and that her story conflicted with the statement that Hargrove had already given police.

Mathena told police Burton was wearing a dark sweatshirt and a ball cap and Hargrove was wearing an orange and black jacket with a white T-shirt underneath. She said that while they had been driving down Chateau Drive, Burton told Hargrove to pull over because Burton had identified Beltran as the "guy that stabbed Andre [Mann]." Mathena said Hargrove asked Burton what he was doing and Burton responded, "Come on. Come on" as both men then got out of the car. Hargrove told Mathena to get in the front seat.

After giving her statement to police, officers placed Mathena and Hargrove in an interview room and videotaped their conversation, which was shown to the jury. During their

- 6 -                                         13-cv-01459-WQH (MDD)

discussion, Mathena became upset and told Hargrove she had lied to the police.

A security guard working at the apartment complex on the night of the shooting testified he heard about six shots from what sounded like a revolver. As the guard investigated, he saw two African-American men in their early 20's running through an alley. The guard testified that one of the men wore all dark clothing and possibly a baseball cap while the other wore a light-colored top and dark pants.

Sometime after 11:00 p.m. on the night of the shootings, Hargrove called his friend Gayle Martin . . . and asked her to pick him up from a taco shop in Clairemont Mesa. Martin agreed. Just after picking up Hargrove and Burton, Martin testified Burton said to Hargrove, "I'm going to jail because of you." Martin also testified both men appeared upset . . . .

On the way to Hargrove's home, they passed the white Cadillac and saw Mathena with the police, which, according to Martin, further upset Hargrove and Burton. In addition, she saw Burton and Hargrove passing between them a grocery-type bag and heard them talk about how to get rid of its contents. After dropping off Hargrove . . . Martin drove Burton home. On the way, Martin slowed down the car and Burton threw something away in a black trash can . . . .

Aune testified that Hargrove called about 12:45 a.m. on March 19, 2008, and asked her to pick him up so they could spend the night together. Hargrove told Aune that he needed a ride because his cousin had the Cadillac. After picking him up, they went to Aune's apartment and then a short time later to a nearby convenience store . . . where they were detained by police.

5. *Burton's arrest and subsequent interviews*

On the morning of March 19, the day after the murder, police arrested Burton. During the initial police interview, Burton denied any knowledge of the shooting, stating that he had been walking the night before in Serra Mesa when Hargrove picked him up in the white Cadillac. Burton told police they then drove to another friend's house where they stayed until 11:00 p.m. and then drove to Hargrove's home.

As police were "processing" Burton at the station, Burton "all of the sudden" nervously told police he wanted to tell them "what really happened" the night before. During [the] second 45-minute interview, which was played for the jury, Burton said Hargrove was the shooter. Burton also said he was afraid for his family after the shooting because of threats made by Hargrove after the shooting.

Burton told police during the second interview Hargrove picked him up about 8:45 p.m. the night before . . . . After eating, the two left in Hargrove's car and followed a van driven by Mathena. After dropping off the van at Mathena's house, all three were returning to Hargrove's house when, according to Burton, they saw "some Mexicans, a dude . . . on his bike." Hargrove pulled over and got out of the car, and went to the trunk, where he pulled out a gun from a large, purple laundry bag. Hargrove and Burton next approached

>two Hispanic males later identified as Beltran and Rosalio. According to Burton, the man on the bike (Beltran) pulled out a gun but the two kept walking. Hargrove then asked, "where are you from" and then, before either could answer, Hargrove started shooting at them when he was about five or six feet away. Hargrove and Burton then fled into the alley where Hargrove hid the gun behind a wall. Hargrove then used a payphone to try and reach Mathena, who had stayed in the Cadillac. When Mathena did not answer, Hargrove called Martin, who eventually picked them up. While trying to reach Mathena, Hargrove kept saying, "it's over," or words to that effect because he believed Mathena was going to "tell" on them.

(Lodg. No. 8 at 2-15) (quoted from the Court of Appeal opinion, with minor edits for clarity).

## IV.  **STANDARD OF REVIEW**

This Petition is governed by 28 U.S.C. § 2254(a), which provides the scope of review for federal habeas corpus claims:

>The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254 provides:

>(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

When determining what constitutes "clearly established federal law" under § 2254(d)(1), federal courts look to United States Supreme

1  Court holdings at the time of the state court's decision. *Lockyer v.*
2  *Andrade*, 538 U.S. 63, 71-72 (2003). A state court's decision is "contrary
3  to" clearly established United States Supreme Court precedent if (1) the
4  state court applies a rule different from the governing law set forth in
5  Supreme Court cases, or (2) the state court confronts a set of facts that
6  are materially indistinguishable from a Supreme Court case, but still
7  reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06
8  (2000); *Lockyer*, 538 U.S. at 73. A state court decision does not have to
9  demonstrate an awareness of clearly established Supreme Court
10 precedent, so long as neither the reasoning nor the result of the state
11 court decision contradict such precedent. *Early v. Packer*, 537 U.S. 3, 8
12 (2002).

13 A state court decision may involve an "unreasonable application" of
14 Supreme Court precedent "if the state court identifies the correct
15 governing legal rule from [the Supreme] Court's cases but unreasonably
16 applies it to the facts of the particular state prisoner's case." *Williams*,
17 529 U.S. at 407. Alternatively, an unreasonable application may be
18 found "if the state court either unreasonably extends a legal principle
19 from [Supreme Court] precedent to a new context where it should not
20 apply, or unreasonably refuses to extend that principle to a new context
21 where it should apply." *Id.* An unreasonable application of federal law
22 requires the state court decision to be more than incorrect or erroneous.
23 *Lockyer*, 538 U.S. at 76. Instead, the state court's application must be
24 "objectively unreasonable." *Id.* The Petitioner bears the burden of
25 proving the state court acted in an unreasonable, or contrary manner.
26 *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

27 The United States Supreme Court has held that "[w]here there has
28 been one reasoned state judgment rejecting a federal claim, later

unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Further, when a state court does not supply reasoning for a decision, an independent review of the record is required to determine if the court clearly erred in applying controlling federal law. *Delgado*, 223 F.3d at 981-82. This independent review is not *de novo*, but merely provides the basis for determining whether the state court decision was objectively reasonable. *Id.* at 982.

## V.  DISCUSSION

Petitioner claims the trial court violated his Fifth and Sixth Amendment rights when it excluded co-defendant Hargrove's statements to police about the Petitioner's mental capacity as inadmissible hearsay. (ECF No. 1 at 8.)

A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1121 (9th Cir. 2005). The right of a defendant to present testimony in his defense is not absolute, as even "relevant and reliable evidence can be excluded when the state interest is strong." *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983). Nevertheless, "the Supreme Court has made clear that the erroneous exclusion of critical, corroborative evidence" can rise to the level of a violation of the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).

1. **Trial Court Proceedings**

California Evidence Code section 1200 generally prohibits the introduction of "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the

matter stated." California Evidence Code section 1220, however, provides an exception to the hearsay rule, stating that "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual capacity or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

Before trial commenced, Petitioner's counsel moved *in limine* to introduce evidence of Hargrove's statements to police in which he stated Petitioner "was kind of slow in the head" and "talks retarded." (Lodg. No. 2 at 1671-72.) Petitioner's counsel provided the trial court several reasons why co-defendant Hargrove's statements were not inadmissible hearsay: (1) the statements fell under an exception to hearsay under California Evidence Code section 1220; (2) pursuant to California Evidence Code 356,[2] the statements completed evidence proffered by the prosecution; and (3) Petitioner offered the statements for the nonhearsay purpose of showing Hargrove's consciousness of guilt. (*Id.* at 1671-73.)

The trial court did not allow admission of co-defendant Hargrove's statements calling Petitioner "slow" and "retarded," and found that the statements were inadmissible hearsay. (*Id.* at 1671-76.) In deciding not to admit Hargrove's statements to police about Petitioner, the trial court explained:

> Well, my initial thought is it's inadmissable [sic] hearsay. It doesn't come in under 1220 because it's not being used against the declarant [co-defendant Hargrove]. . . .
> . . . .

---

[2]California Evidence Code section 356 provides "[w]here part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

- 11 - 13-cv-01459-WQH (MDD)

> You certainly can mention in your opening statement, "I expect you're going to see and hear an interview of my client and I think it will be pretty apparent to you that he is a little slow. . . . [T]hat's okay . . . because [the jury is] going to see and hear that video.
>
> [A]lthough [the statements] might show some consciousness of guilt on Hargrove, I don't think that makes it admissible. I don't think that gets around the hearsay rule.
>
> I think under 1220 it doesn't come in. Maybe some other theory. And, of course, there may be some nonhearsay theory.
>
> Okay. So for now, that's my ruling.

(*Id.* at 1674-76) (quoted from the Reporter's Appeal Transcript, with minor edits for clarity.)

### 2. **State Court Appeal**

On appeal, Petitioner argued the trial court abused its discretion and violated his Fifth and Sixth Amendment rights when it denied Petitioner the right to introduce Hargrove's statements during trial. (Lodg. No. 3 at 23.) Petitioner contended that Hargrove's statements are nonhearsay circumstantial evidence of Hargrove's guilty state of mind. Specifically, Petitioner asserted "a statement that is not offered for its truth is not hearsay, and a statement that does not directly declare a mental state but merely reflects circumstantial evidence of that state of mind is not hearsay because it is not received for the truth of the matter stated, but as relevant nonhearsay determination of the declarant's state of mind." (Lodg. No. 3 at 30) (internal citations omitted.) Petitioner further contended that the relevant state of mind is Hargrove's consciousness of guilt; " [. . .] Hargrove's comments about appellant were admissible to reflect his efforts to deflect culpability for the shooting by implying appellant was too dumb to be taken seriously by the police." (*Id.* at 31.) Under the consciousness of guilt theory, Petitioner contends that Hargrove's statements demonstrated his assessment that "[co-

defendant Hargrove and his girlfriend] could get away with pointing at [Petitioner] because he is kind of slow," and if Petitioner gave police a different story than conveyed, "it's because he's retarded, he's slow." (Lodg. No. 2 at 1673.)

The California Court of Appeal noted that under California law, "statements of a party, or party admissions, are admissible against the party declarant, which is Hargrove, and not Burton." (Lodg. No. 6 at 17.) Additionally, section 1220 requires that the statement is offered by the party opposing the declarant (Hargrove), "which in this case is the People, and not Burton." (*Id.*) (citing *People v. Castille*, 108 Cal. App. 4th 469, 479 (2003).) The state appellate court observed that Petitioner offered Hargrove's statements for the truth of the matter–to show Hargrove believed Petitioner to be "'a very simple young man' and a 'little bit different,' and thus incapable of dealing with the murder or possessing the wherewithal to protect or safeguard himself against or from accusations that he was the shooter because he was in fact 'slow' and/or 'retarded.'" (Lodg. No. 6 at 16.)

The Court of Appeal concluded the trial court properly exercised its discretion in deciding to exclude Hargrove's statements as inadmissible hearsay. The Court of Appeal further noted that even assuming Hargrove's statements had a nonhearsay purpose, and that the trial court erred in not admitting the statements, the error was harmless. (*Id.*) The state appellate court explained as follows:

> First, [Petitioner ] was not precluded from presenting evidence to the jury that he was allegedly "slow." As the trial court noted, the defense was certainly entitled to argue to the jury that [Petitioner] was in fact "slow" (in connection with some defense theory), as evidenced (according to defense counsel) by the video-taped interview of Burton conducted by police shortly after his arrest in which Burton made noises and sounds like a child. Thus, we conclude it was not reasonably probable that a result more favorable to [Petitioner] would

have been reached absent the trial court's alleged error in failing to admit the statements by Hargrove.

Second, there is ample evidence to support the jury's finding that [Petitioner] was in fact the shooter, a finding [Petitioner] does not directly challenge on appeal. The record shows that at trial Rosalio identified [Petitioner] as the shooter with 70 percent certainty; that Rosalio testified the shooter wore a dark hooded sweatshirt, had darker skin than the person with the shooter and exited the white Cadillac from the passenger seat. The record further shows [Petitioner] wore a dark hooded sweatshirt on the night of the crime, the same sweatshirt police found in his room when they arrested him the following day, and that [Petitioner] in fact had darker skin than Hargrove. In addition, the record shows Hargrove drove the white Cadillac on the night of the killing and that he and Aune owned the Cadillac.

Moreover, the clothing of the shooter described by Rosalio matched the description of [Petitioner's] clothing Mathena provided to police. Mathena also confirmed that [Petitioner] sat in the passenger seat of the Cadillac immediately prior to the shooting, before the passenger exited the vehicle.

Finally, shortly after the shooting a security guard saw two African-American males running through some apartments, one of whom wore dark clothing and the other a light shirt. The security guard's description of the clothing worn by the suspects generally matched the actual clothing worn that evening by [Petitioner] and Hargrove.

In light of such evidence in the record supporting the jury's finding that Petitioner was the shooter, we conclude it was not reasonably probable [Petitioner] would have achieved a more favorable result absent the trial court's alleged error in excluding the statements by Hargrove regarding [Petitioner's] mental acuity. See *People v. McKinnon* 52 Cal. 4th 610, 673 (2011) [any error by the trial court in admitting hearsay statements was harmless because other, independent evidence "substantially incriminated" the defendant and the hearsay statements were, in any event, "cumulative and of minor value."]; see also *People v. Houston* 130 Cal. App. 4th 279, 301 [admission of hearsay harmless when other evidence of defendant's guilt was "overwhelming" and hearsay was not "cumulative" and "tangential" on the issue of defendant's guilt].

(Lodg. No. 6 at 18-19) (quoted from the Court of Appeal, with minor edits for clarity).

**3.    Analysis**

The issue before this Court is whether the state appellate court's ruling was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). For the purpose of federal

1  habeas review, whether an evidentiary ruling is correct under state law is
2  not relevant; the only question is whether the ruling rendered the trial so
3  fundamentally unfair as to violate due process. *Larson v. Palmateer*, 515
4  F.3d 1057, 1065 (9th Cir. 2008). In order for an evidentiary ruling to be
5  so fundamentally unfair as to allow issuance of the writ, the trial court's
6  decision must have violated clearly established federal law. *Carey v.*
7  *Musaladin*, 549 U.S. 70, 74 (2006). A legal principle is "clearly
8  established" within the meaning of § 2254(d)(1) if it is embodied in a
9  holding of the Supreme Court. *Id.* at 77. "The Supreme Court has made
10 clear that the erroneous exclusion of critical, corroborative defense
11 evidence may violate both the Fifth Amendment due process right to a
12 fair trial and the Sixth Amendment right to present a defense." *DePetris,*
13 239 F.3d at 1062 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294
14 (1973)).

15     Petitioner contends that the trial court erred in excluding
16 Hargrove's statements because the statements were admissible
17 nonhearsay evidence of "Hargrove's consciousness of guilt as the
18 triggerman for the shootings." (ECF No. 1 at 8.) Petitioner contends the
19 value of the statements was not for their "underlying truth," but rather
20 for how "they reflected Hargrove's attempt at 'damage control.'" (*Id.* at 9.)
21 Specifically, by suggesting to the police that Petitioner was "too dumb to
22 be believable, Hargrove revealed a state of mind that was highly relevant
23 to the defense theory that he, and not Petitioner" was the shooter. (*Id.*)

24     Respondents contend Petitioner is not entitled to habeas relief
25 because the state courts reasonably determined that the exclusion of
26 Hargrove's statements did not prevent Petitioner from presenting a
27 defense. (ECF No. 7 at 8.) Respondents also contend that allowing the
28 statements would have done nothing to refute the weighty evidence

1  against Petitioner. (*Id.* at 8,13.)

2  Petitioner is not entitled to habeas relief. Even accepting Petitioner's contention that Hargrove's statement was entered for a non-hearsay purpose, the Court of Appeal determined, consistent with the trial court, the statements were of minimal relevance under California Evidence Code section 352. (*Id.*) In addition, the Court of Appeal conducted an error analysis based on the trial court's decision not to admit the statements. (*Id.* at 17.) The Court of Appeals determined that any resulting error was harmless because "it was not reasonably probable [Petitioner] would have achieved a more favorable result absent the trial court's alleged error in excluding the statements. (*Id.* at 19.) Specifically, there was "ample evidence" supporting the finding that Petitioner was the shooter. (*Id.* at 18.)

Where evidence has been excluded based on state evidentiary law, the Ninth Circuit uses a balancing test to determine whether a trial court's exclusion of evidence violates a petitioner's due process rights. *Chia v. Cambra,* 360 F.3d 997,1003 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985)). "[W]eighing the importance of the evidence against the state's interest in exclusion[,]" the court considers the following factors: (1) the probative value of the evidence on the central issue; (2) the reliability of the evidence; (3) whether the evidence is capable of evaluation by a trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia,* 360 F.3d at 1004 *(*citing *Miller*, 757 F.2d at 994).

Here, the *Miller* factors support the exclusion of Hargrove's statements, regardless of whether Petitioner offered the statements for a

nonhearsay purpose. First, Hargrove's statements about Petitioner's mental capacity were not probative of the central issue of the identity of the shooter. Second, there are no indicators of reliability of the statements. Third, Petitioner's intended use of the statements for the purpose of proving Hargrove was the shooter was not the only evidence on the issue of the identity of the shooter. As the Court of Appeal explained, the other victim, Rosalio H., identified Petitioner as the shooter and identified that Petitioner was wearing a dark hooded sweatshirt. Two other witnesses corroborated Rosalio's description of what Petitioner was wearing on the night of the shooting. Lastly, Hargrove's statements did not constitute a major part of Petitioner's defense. As the Court of Appeal noted, "[o]n appeal, [Petitioner] [did] not directly attack the evidence in support of the jury's finding that he was the shooter." (Lodg. No. 6 at 2.) Taken together, the first, third, fourth and fifth *Miller* factors weigh in favor of excluding Hargrove's statements, and support the Court of Appeal's determination that the exclusion of the statements did not violate Petitioner's Fifth and Sixth Amendment rights because the trial court did not exclude critical, corroborative defense evidence.

Thus, the trial court's exclusion of the statements as inadmissible hearsay did not deprive Petitioner of the opportunity to present a defense. The trial court's ruling, regardless of the characterization of the statements as hearsay or nonhearsay, did not render the trial so fundamentally unfair as to violate Petitioner's due process rights. *Chia*, 360 F.3d at 1003.

Accordingly, the Court **RECOMMENDS** Petitioner's Petition for writ of habeas corpus be **DENIED**.

### 4. Evidentiary Hearing

The Supreme Court has held that evidence introduced in federal

court "has no bearing on section 2254(a)(1) review." *Cullen v. Pinholster*, __ U.S.__ 131 S. Ct. 1388, 1400 (2011). Thus, when a state court precludes a Petitioner's habeas relief, a district court "is not required to hold an evidentiary hearing." *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("an evidentiary hearing is not required on issues that can be resolved by reference to the state court record.").

Here, Petitioner is not entitled to an evidentiary hearing. The state supreme court has already precluded Petitioner's habeas relief. Further, Petitioner's claim that the trial court improperly excluded evidence of co-defendant Hargrove's statements can be resolved with reference to the record.

## VI. CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Petition for Writ of Habeas Corpus be **DENIED.**

**IT IS HEREBY ORDERED** that any written objection to this REPORT must be filed with the Court and served on all parties no later than **May 13, 2014.** The document should be captioned "Objections to Report and Recommendations.

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **May 27, 2014.**

The parties are advised that failure to file objections within the specific time may waive the right to raise those objections on appeal of the Court's order. *Turner v. Duncan*, 158 F.3d 1998 (9th Cir. 1998).

**IT IS SO ORDERED.**

DATED: April 21, 2014

Hon. Mitchell D. Dembin
U.S. Magistrate Judge